In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2683

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN PSIHOS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 1026—**Blanche M. Manning**, *Judge.*

ARGUED DECEMBER 8, 2011—DECIDED JUNE 15, 2012

Before MANION, ROVNER, and TINDER, *Circuit Judges.*

MANION, *Circuit Judge.* John Psihos pleaded guilty to
four counts of making false statements in a tax return.
The district court determined that the tax loss was
$837,724 and sentenced Psihos to 24 months' imprison-
ment, which was the low end of the applicable guideline
range. The court also ordered Psihos to pay $837,724
in restitution. Psihos appeals, arguing that the tax loss
was only $22,292.27; that the restitution amount was

erroneous; and that the district court procedurally erred in sentencing him within the guideline range without addressing his argument for an outside-the-guidelines sentence. We affirm.

## I.

John Psihos immigrated to the United States from Greece in his early twenties. He eventually opened his own restaurant and later went on to own three restaurants in the Chicago area: Flanagan's (the most successful of the three), Café Oceana, and Full Moon. Flanagan's and Full Moon were organized together as one S-Corporation and Café Oceana was set up as a separate S-Corporation. Psihos was apparently a good employer, assisting employees in need; he was also very generous to those in the community, helping with various charitable causes.

While hard-working and generous, Psihos was also operating illegally, at least when it came to his tax obligations. Psihos kept two sets of books for Flanagan's, and for (at least) the four tax years of 2001-2004, he substantially underreported his gross receipts. The government discovered the tax fraud when Psihos listed Flanagan's for sale through a real estate brokerage company. A fact sheet prepared by the broker calculated Flanagan's average monthly gross receipts at $170,000 and average annual gross receipts at $2,040,000. This netted an average yearly operating profit of $554,840. Based on the discrepancy between Psihos's tax filings

and this information, the IRS dispatched undercover agents to pose as potential buyers.

The undercover agents, posing as a husband and wife interested in purchasing Flanagan's, individually or together met with Psihos three times in April and May of 2005. During these meetings, Psihos explained how he kept track of the actual receipts at Flanagan's. He explained that each night at closing, the managers would bring him envelopes with all of the money, receipts, register tapes, and payout information. He would then provide this material to Wendy, one of his managers, who would prepare a weekly summary report. Psihos showed these summary reports to the undercover agents, along with the envelopes from which these summaries were prepared. Psihos stated that he had these records showing what he was "actually getting" from the restaurant going back to 2001.

On May 31, 2005, agents executed a search warrant at one of Psihos's restaurants and seized, among other items, the weekly summary sheets. Later they also seized from a storage shed the envelopes detailing Flanagan's nightly sales and cash payouts. IRS revenue agents reviewed the weekly summary sheets and cross-referenced those figures with the nightly figures listed on the envelopes. Based on these records, the revenue agents calculated the gross receipts actually collected at Flanagan's for the tax years 2001-2004. In calculating the gross receipts, the IRS made adjustments based on any cash overages/shortages noted, as well as based on the amounts noted on the envelopes as improperly entered

or listed as cash payouts. The government's calculation was as follows:

| Year | Net Receipts Per IRS | Gross Receipts Per Return | Unreported Receipts Per IRS |
|------|----------------------|---------------------------|-----------------------------|
| 2001 | $2,021,304.37 | $1,420,405.00 | $600,899.37 |
| 2002 | $2,003,204.59 | $1,323,240.00 | $679,964.59 |
| 2003 | $2,007,044.71 | $1,298,778.00 | $708,266.71 |
| 2004 | $1,867,214.82 | $1,320,832.00 | $546,382.82 |

The IRS then concluded that the additional taxes due on Psihos's personal tax returns, based on these unreported receipts, were: $226,752 for 2001, $244,799 for 2002, $213,186 for 2003, and $152,987 for 2004. These unreported receipts resulted in a total tax loss to the IRS of $837,724 for the period of 2001 through 2004.

Based on the above, a grand jury indicted Psihos on eight counts. Counts 1-4 charged tax evasion and counts 5-8 charged Psihos with four counts of making false statements in a tax return. Psihos entered into a plea agreement with the government and pleaded guilty to the four counts of making false statements in a tax return. At sentencing, the government argued that the loss was $837,724, while Psihos countered that the government's figure did not account for numerous deductible expenses. Specifically, Psihos argued that the tax loss should be reduced by: amounts paid to DJ/promoters from door charges; amounts paid in cash wages; the cost of complimentary drinks and food; the total he transferred to his other restaurant Café Oceana;

and cash payments made to Café Oceana for food supplied by Café Oceana to Flanagan's. Psihos submitted a chart summarizing his position on the amount of the tax loss (attached to this opinion as Exhibit A). Psihos then argued that based on his calculations, the tax loss would be 28% of the total unreported gross of $79,615.26, or $22,292.27.

The district court gave Psihos credit for the cash payouts listed on the envelopes—as had the government in its loss calculation—but rejected his remaining claimed reductions, concluding that the various offsets he proposed amounted to "unclaimed deductions" and that it could not consider such deductions based on this court's decision in *United States v. Chavin*, 316 F.3d 666 (7th Cir. 2002). The court added that *Chavin* was "particularly well-taken" in this case because Psihos did not have any invoices supporting his purported cash payouts.

After the district court rejected Psihos's arguments concerning the loss calculation, Psihos argued that he should nonetheless receive a sentence below the guideline range because the calculated loss overstated the harm to the government. In sentencing Psihos, the district court did not specifically discuss this argument, but concluded that a sentence of 24 months (the low end of the guideline range, which was 24-30 months) was appropriate in this case. The district court also ordered Psihos to pay restitution in the amount of $837,724. Psihos appeals.

**II.**

On appeal, Psihos argues that the district court erred in determining the tax loss for sentencing purposes and that the true loss was only $22,292.27. Relatedly, he argues that the district court erred in ordering restitution of $837,724 because the actual loss was only $22,292.27. Finally, Psihos claims that the district court procedurally erred in sentencing him within the guideline range without considering his argument for a lower sentence. We consider each issue in turn.

**A. Tax Loss**

Psihos argues on appeal that the district court erred in calculating the tax loss for sentencing purposes at $837,724. As detailed above, Psihos claims that the real loss to the government was only $22,292.27 because the government's calculation failed to take into account cash payments for excludable items and/or deductible expenses, including cash payments to DJs and promoters from door charges, cash wages, the cost of complimentary drinks and food, cash transfers to his other restaurant Café Oceana, and cash payments to Café Oceana for food supplied by Café Oceana to Flanagan's.

As the district court found, Psihos's argument is foreclosed by this court's decision in *United States v. Chavin*, 316 F.3d 666 (7th Cir. 2002). In *Chavin*, the defendant had argued that the tax loss for sentencing purposes should take into account available deductions that he could have taken. This court rejected that argument, first

noting that the "the government [had] contend[ed] that 'tax loss' refers to the amount of loss that the defendant attempted or intended to create through his tax offense. [And] [i]f we accept this interpretation, then unclaimed deductions should not be taken into account because they have no relevance to the amount of loss that the scheme attempted to produce." *Id.* at 677. This court then held:

> It is apparent from the definition of "tax loss" provided in the guidelines that the government has the correct position. The guidelines state that "tax loss is the total amount of loss that was the object of the offense." § 2T1.1(c)(1). We take the phrase "the object of the offense" to mean that the attempted or intended loss, rather than the actual loss to the government, is the proper basis of the tax-loss figure. Here, the object of Chavin's offense was the amount by which he underreported and fraudulently stated his tax liability on his return; reference to other unrelated mistakes on the return *such as* unclaimed deductions tells us nothing about the amount of loss to the government that his scheme intended to create.

*Id.* (emphasis added). *Chavin* thus makes clear that Psihos's alleged cash payments are irrelevant in determining the tax loss caused by his fraudulent statements.

Psihos counters that *Chavin* is distinguishable because it concerned deductions and not "above-the-line" reductions from gross income. The government and Psihos then duel over whether the various cash payments would be considered deductions or above-the-line re-

ductions from gross income. The distinction, however, is irrelevant—the point of *Chavin* is the same: tax loss is based on the object of the offense and should not take into account "unrelated mistakes." *Id.* In fact, in noting that "unrelated mistakes" were irrelevant to the loss calculation, the court in *Chavin* said "such as unclaimed deductions," showing that "unclaimed deductions" were merely illustrative of the types of mistakes or omissions which should not be considered in calculating the loss.

Alternatively, Psihos requests that this court overrule *Chavin* based on a recent Tenth Circuit decision, *United States v. Hoskins*, 654 F.3d 1086 (10th Cir. 2011). In *Hoskins*, the Tenth Circuit said that the sentencing guidelines do "not categorically prevent a court from considering unclaimed deductions in its sentencing analysis." *Id*. at 1094. The *Hoskins* court also noted, however, that the guidelines do not require a sentencing court to engage in the "nebulous and potentially complex exercise of speculating about unclaimed deductions" where the defendant "offers weak support" for his tax-loss estimate. *Id.* (internal quotation omitted). In this case, even if we were to follow the reasoning of *Hoskins*, Psihos would not benefit because, as the district court concluded, there was an utter lack of support for Psihos's claimed cash payments. While he had kept meticulous records of the cash receipts and also kept detailed notes of some cash offsets, Psihos has absolutely no documentation to support his other claimed cash payments. For the same reason, Psihos's reliance on dicta from the Second Circuit indicating that a tax loss under the guidelines could be adjusted for "legitimate but

unclaimed deductions," *United States v. Martinez-Rios*, 143 F.3d 662, 671 (2d Cir. 1998); *United States v. Gordon*, 291 F.3d 181, 187 (2d Cir. 2002), serves him no better. In short, even if the sentencing guidelines did not "categorically prevent a court from considering unclaimed deductions," *Hoskins*, 654 F.3d at 1094, the absence of any contemporaneous supporting documentation of the purported cash outflows makes this case well suited to the general rule established in *Chavin*—that other deductions are not considered in determining the tax loss. Under these circumstances, we see no reason to reconsider our decision in *Chavin*.

## B. Restitution

Psihos next argues that even if the $837,724 tax loss calculation was permissible for guideline purposes, the district court erred in ordering restitution in that amount because that was not the true loss the government suffered. Psihos acknowledges that, before the district court, he did not distinguish between tax loss and restitution; rather, he told the district court that the tax loss would be a guiding principle in determining the restitution amount. Accordingly, this court's review is for plain error. *See United States v. Salem*, 597 F.3d 877, 884 (7th Cir. 2010). As we have oft repeated, "under the plain error standard, the party asserting the error bears the burden of persuasion on the following points: (1) that there is error, (2) that the error is plain, and (3) that the error 'affects substantial rights.'" *United States v. Jumah*, 493 F.3d 868, 875 (7th Cir. 2007) (quoting *United States v.*

*Olano,* 507 U.S. 725, 732-34 (1993)). "If these three conditions are met, the court may exercise its discretion to notice a forfeited error, but only if it (4) 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Day,* 418 F.3d 746, 750 (7th Cir. 2005) (quoting *Olano,* 507 U.S. at 732).

Psihos is correct that the "intended loss" for guideline purposes is broader than the loss for purposes of restitution; a restitution order, unlike a calculation of loss under the guidelines, must be based on the amount of the loss actually caused by the defendant. *United States v. Dokich*, 614 F.3d 314, 319 (7th Cir. 2010). But the district court did not plainly err in ordering restitution of $837,724 because, as the district court found, Psihos's claimed cash outflows were not adequately supported. Psihos kept detailed records for Flanagan's and those records included a daily listing of cash payouts, but there was no contemporaneous documentation of the purported payouts to bouncers, promoters, for purported complimentary food and drink given to customers, or for transfers or payments to Café Oceana. The government need only prove the amount of restitution by a preponderance of the evidence and where there are detailed records showing the actual loss, it is entirely reasonable for a court to conclude that allegations of undocumented expenses do not overcome the government's proof.

While it would have been helpful had the district court expressly stated that it found that the $837,724 represented both the intended loss for guideline

purposes and the actual loss for restitution purposes, given that Psihos did not argue that there was a distinction between the two, it is understandable that the district court was not more explicit in its holding. But, after noting that "the government had given Psihos credit for payouts reflected in seized records," the court stated that it rejected "the defendant's assertion that he should be given credit for hundreds of thousands of dollars of additional but completely undocumented cash payouts and transfers between his restaurants." While Psihos points to affidavits from employees indicating that the claimed payouts were made, because the record also supports the conclusion that $837,724 is the actual loss, Psihos cannot show that there was an error which affected his substantial rights. *See United States v. Arroyo*, 406 F.3d 881, 890 (7th Cir. 2005) (stating that "although the district court did not make explicit findings tying defendant's cocaine distribution to his heroin offense, the record could support the conclusion that the two offenses were part of the same course of conduct" and therefore defendant could not show an error which affected his substantial rights).

Moreover, even if we were to find plain error, under the circumstances of this case, we would decline to exercise our discretion to notice that forfeited error for several reasons. First, there is absolutely no basis to determine the amount of purported cash payments because, even under Psihos's version of events, he did not keep track of the various claimed outlays. Second, and relatedly, if Psihos had truly shifted cash to Café Oceana—the largest reduction he seeks—then he would

be entitled to a reduction in restitution only if Café Oceana had reported those cash inflows as revenues; yet Psihos lacks the corresponding records from Café Oceana showing its receipt of those funds, and in turn its reporting the money as revenue to the IRS. Third, Psihos kept no record of the cash payments to bouncers and promoters, which in turn creates a near certainty that the government suffered a loss of taxes owed by those recipients. Under all of these circumstances, we would not exercise our discretion to notice the claimed error.

### C.  Challenge to Sentencing

Finally, Psihos argues that the district court erred procedurally in sentencing him because it did not consider his request for a sentence below the guideline range based on his claim that the tax loss overstated the seriousness of the offense. It is true that the district court did not expressly discuss this argument in sentencing Psihos to 24 months' imprisonment—the low end of the range. But in rejecting Psihos's arguments for a lower tax loss calculation, the district court made clear that a lower figure was not justified because Psihos had not provided adequate documentation. Under these circumstances, there was no reason for the district court to discuss Psihos's argument in more detail when setting the sentence at 24 months. And in sentencing Psihos, the district court stated that it had considered Psihos's arguments, but that the need to provide deterrence in the arena of self-reporting taxes justified the sentence. The district court's 24-month sentence was

presumptively reasonable because it was within the guideline range and there is no basis for us to overcome that presumption. *United States v. Moreno-Padilla*, 602 F.3d 802, 810 (7th Cir. 2010). Accordingly, the district court's sentence stands.

## III.

The district court did not err in determining that the tax loss caused by Psihos's offense was $837,724. Other cash payments that Psihos could have used to reduce his taxable income cannot be considered based on this court's decision in *Chavin*—a decision we decline to overturn. And even if the tax loss could be reduced by such cash payments, Psihos, as the district court found, has not established that he actually made the claimed payments. For this reason, the district court did not commit plain error in ordering restitution of $837,724. Finally, the district court did not err procedurally in sentencing Psihos within the guideline range without discussing his argument for a lower sentence based on a lower actual loss. The 24-month sentence, which was at the low end of the guideline range, was reasonable. We AFFIRM.

**Exhibit A**

| Year | Govt Adj. Gross | Minus Door* | Minus Tips* | Minus P/O's^ | Minus Oeana** | Minus Tabs** | Total | Reported | Difference |
|---|---|---|---|---|---|---|---|---|---|
| 2001 | $2,3313,835.63 | $161,715.28 | $59,2220.48 | $173,069.37 | $300,000 | $48,000 | $1,471,830.50 | $1,420,405.00 | $51,425.50 |
| 2002 | $2,142,576.82 | $170,356.00 | $66,273.53 | $171,286.22 | $300,000 | $48,000 | $1,386,661.07 | $1,323,240.00 | $63,421.07 |
| 2003 | $2,161,689.61 | $298,855.34 | $60,407.85 | $170,786.11 | $300,000 | $48,000 | $1,283,640.31 | $1,298,788.00 | ($15,147.69) |
| 2004 | $2,049,261.96 | $132,155.00 | $79,508.82 | $188,889.76 | $300,000 | $48,000 | $1,300,748.38 | $1,320832.00 | ($20,083.62) |

Explanations for the table's notations were:

*Drink credits were given as part of the door admission, but have not been quantified.

^P/O's include cash payouts listed on the envelopes (not including payouts from door proceeds) and $6,000 per month cash payroll.

**Amounts are approximate.