FILED
United States Court of Appeals
Tenth Circuit

August 12, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JODI HOSKINS,

Defendant-Appellant.

No. 10-4131

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 08-CR-277-DB-2)**

W. Andrew McCullough, McCullough & Associates, LLC, Midvale, Utah, for
Appellant.

Alexander P. Robbins (John A. DiCicco, Acting Assistant Attorney General,
Frank P. Cihlar and Gregory Victor Davis, Attorneys, and Carlie Christensen,
Acting United States Attorney, Of Counsel, with him on the brief) Tax Division,
Department of Justice, Washington, District of Columbia, for Appellee.

Before **BRISCOE**, Chief Judge, **TYMKOVICH**, and **GORSUCH**, Circuit
Judges.

**TYMKOVICH**, Circuit Judge.

This case requires us to consider a sentencing judge's discretion in

establishing tax loss resulting from a tax evasion scheme. Jodi Hoskins was

convicted of tax evasion after she and her husband[1] failed to pay taxes for income they earned from Companions, a Salt Lake City escort service. The government contended the Hoskinses failed to account for more than one million dollars in income the escorts generated in cash payments and credit card receipts. At sentencing, the government's tax loss was relevant to potential jail time and restitution under United States Sentencing Guidelines (USSG) § 2T1.1.

To minimize the tax loss for these purposes, the Hoskinses offered to the court hypothetical tax returns (it was too late to submit amended returns to the IRS) that accounted for the unreported income and attempted to take deductions they claimed they would have been entitled to but for the tax evasion. The district court rejected the tax returns and accepted the government's tax-loss estimate. As we explain below, the district court did not err in rejecting the hypothetical return. We also dismiss Jodi Hoskins's challenges to the sufficiency of the evidence supporting her conviction, and the reasonableness of her sentence.

Having jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we therefore AFFIRM.

---

[1] Roy Hoskins pleaded guilty and separately appeals his sentence. *See United States v. Hoskins*, No. 10-4092 (10th Cir. 2010)

# I. Background

Beginning in 2000, Jodi Hoskins (Hoskins) managed and operated Companions, a Salt Lake City escort service founded and owned by her then-boyfriend and future husband, Roy Hoskins, who she married in April 2003. Hoskins managed Companions' office, supervised employees, coordinated escort reservations, and maintained Companions' credit card receipt books. Hoskins's name was on Companions' bank account, and with her husband, she oversaw the company's finances. According to a Companions employee, Hoskins "controlled everything and ran the business." R., Vol. II at 377.

Although they did not marry until 2003, the Hoskinses filed a joint U.S. Individual Income Tax Return, Form 1040, for tax year 2002. As a Schedule C business, Companions did not file its own tax return; rather, the Hoskinses accounted for Companions' income on their personal returns. Thus, the joint 2002 return filed by the Hoskinses, which was prepared by an accountant, reported Companions' income and expenses. Although Roy Hoskins owned Companions and provided most of the information supporting the 2002 return, Jodi Hoskins signed the return as well.

The 2002 return reported $902,750 in gross receipts from Companions. After an investigation, the government discovered that Companions received at least $1,053,552 in credit-card payments alone in 2002. Further, because Companions escorts explained that the company received 50–70% of its payments

in cash, the government projected the cash intake for 2002 was equal to the credit-card receipts. Thus, the government estimated that Companions' 2002 gross receipts were $2,107,104—more than $1.2 million in excess of the income claimed by the Hoskinses. The government also contended that some of the escorts were engaged in prostitution, and that Hoskins knew about the criminal activity.

In 2008, a federal grand jury charged Jodi Hoskins with willfully attempting to evade or defeat Roy Hoskins's 2002 federal income taxes, in violation of 26 U.S.C. § 7201. Hoskins was convicted after a three-day bench trial. At sentencing, the district court credited the government's estimates and found that for 2002, the joint tax return filed by the Hoskinses failed to report approximately $1.2 million in gross receipts, which resulted in a tax loss to the government of more than $485,000. The district court rejected Hoskins's alternative accounting of the tax loss based on a hypothetical tax return that indicated a tax loss of $160,202.

Under the USSG, Hoskins was subject to a base offense level of 20 and a criminal history category of III. The district court pointed to the prostitution activities of Companions' escorts and applied a two-level enhancement because it found Hoskins "failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity." USSG § 2T1.1(b)(1). Accordingly, the presentence report's (PSR) recommended sentencing range was

51 to 63 months. The lower tax-loss estimate offered by Hoskins would have moved the guideline range to 33 to 41 months. The district court used the higher range but applied a downward variance and sentenced Hoskins to 36 months' imprisonment.

Contesting the district court's factual findings, analysis, and sentencing calculation, Hoskins appeals her conviction and sentence.

## II. Discussion

Hoskins raises three challenges on appeal: (1) the evidence was insufficient to support her conviction, (2) the district court's calculation of the government's tax loss was clearly erroneous, and (3) the district court erred in applying a sentencing enhancement for failing to report or identify sources of income derived from criminal activity. We discuss each in turn.

### A. Sufficiency of the Evidence

Hoskins first contends insufficient evidence supports her conviction. She argues the government failed to establish that she willfully intended to submit false tax returns, because she claims she signed the 2002 return without knowing or understanding the need for and legal consequences of reporting understated income.

We review sufficiency of the evidence de novo. *United States v. Parker*, 553 F.3d 1309, 1316 (10th Cir. 2009). Under due process principles, evidence is sufficient to support a conviction if, viewing the evidence and all reasonable

inferences therefrom in the light most favorable to the government, a rational trier of fact could find guilt beyond a reasonable doubt. *Id.*; *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "We will not weigh conflicting evidence or second-guess the fact-finding decisions of the [district court]." *United States v. Summers*, 414 F.3d 1287, 1293 (10th Cir. 2005).

Hoskins was convicted under 26 U.S.C. § 7201, which makes it a felony for "[a]ny person [to] willfully attempt[] in any manner to evade or defeat any tax." To prove evasion under § 7201, "the government must show (1) a substantial tax liability, (2) willfulness, and (3) an affirmative act constituting evasion or attempted evasion." *United States v. Thompson*, 518 F.3d 832, 850 (10th Cir. 2008) (quotation omitted). Hoskins argues, first, that there was insufficient evidence of her willful intent to commit tax evasion, and second, that signing the 2002 tax return did not constitute an affirmative act of evasion. We are not persuaded by either argument.

### 1. Willfulness

Under § 7201, "willfulness" means the "voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991) (quotation omitted). "[I]f the Government proves actual knowledge of the pertinent legal duty, the prosecution, without more, has satisfied the knowledge component of the willfulness requirement." *Id.* at 202. Actual knowledge is a strict requirement. "[C]arrying this burden requires [the government to] negat[e] a

defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax laws." *Id.* at 202; *see also United States v. Chisum*, 502 F.3d 1237, 1241 (10th Cir. 2007). Hoskins argues she had a good faith belief she was not breaking the tax laws when she signed and submitted the false 2002 return.

Despite § 7201's exacting intent requirement, the record supports the district court's finding that Hoskins willfully evaded her income taxes. At trial, the government demonstrated numerous facts implicating Hoskins in a scheme to evade taxes. First, the record is clear that although in 2002 Roy Hoskins owned Companions, Jodi Hoskins actively managed the company's affairs and held herself out as a co-owner. According to a Companions employee, Jodi Hoskins "was the manager and owner, basically the person in charge of the company." R., Vol. I at 139. The district court heard evidence that in connection with her managerial role, Hoskins supervised employees, enforced office rules, maintained the company's credit-card receipt book, dealt with the IRS in connection with 2003 tax returns, and had signatory authority over Companions' bank account. Indeed, the accountant retained by the Hoskinses believed Jodi and Roy were equally knowledgeable about the business's finances.

In short, the government established Hoskins (1) was familiar with Companions' finances, (2) knew of the obligation to report all business income on

the company's return, (3) in the past, had reminded Companions' escorts of their obligation to report tip income on their personal tax returns, and (4) told an IRS Special Agent that she had been informed of her obligation to file Form 1099s for the escorts' income. This evidence together shows Hoskins knew of her legal duty to file an accurate tax return, and negates an inference that she acted in good faith in signing and filing the return.

Thus, the district court had ample evidence to conclude Hoskins knew of her legal duty to file accurate tax returns and knew the state of Companions' finances. And it is plain that despite this knowledge, Hoskins voluntarily signed a tax return that underreported more than $1.2 million in gross receipts.

Accordingly, we will not disturb the district court's finding of willfulness, which was reasonable and supported by the record.

### 2. *Affirmative Act*

To be liable under § 7201, a defendant must do more than passively fail to file a tax return; the statute also "requires a positive act of commission designed to mislead or conceal." *Thompson*, 518 F.3d at 852 (quotation omitted). Importantly, however, "[t]he government only need[s] to show *one* affirmative act of evasion for each count of tax evasion." *Id.* (emphasis added).

Hoskins admitted at trial that she signed the false 2002 return. This alone was sufficient to establish an affirmative act under § 7201, and even more so given the factfinder's conclusion she knew the contents were inaccurate. *See*

*Boulware v. United States*, 552 U.S. 421, 424 n.2 (2008) (requiring "*an affirmative act constituting an evasion or attempted evasion of the tax*" (emphasis added)); *Sansone v. United States*, 380 U.S. 343, 351–52 (1965) ("[I]t is undisputed that petitioner filed a tax return and that the petitioner's filing of a false tax return constituted a sufficient affirmative commission to satisfy that requirement of § 7201."); *United States v. Gonzales*, 58 F.3d 506, 509 (10th Cir. 1995) (explaining that "signing and filing . . . a false" document with the IRS is a classic affirmative act of evasion); *Wainwright v. United States*, 448 F.2d 984, 986 (10th Cir. 1971) ("[W]henever the facts appear beyond a reasonable doubt from the evidence in the case that the accused ha[s] signed his tax return, a jury may draw the inference and find that the accused had knowledge of the contents of the return."). By knowingly signing the 2002 tax return, Hoskins took responsibility for its inaccurate contents, and thus she cannot now escape criminal liability.

Sufficient evidence supported the court's finding that Hoskins acted affirmatively to mislead and conceal.

## B. Tax-Loss Calculation

Next, Hoskins proposes two reasons why the district court erred in calculating the tax loss suffered by the government, which in turn affected the applicable sentencing range. First, she says the court improperly refused to adjust the government's tax loss based on unclaimed tax deductions she offered.

-9-

Second, she asserts the court erroneously included commissions and tips kept by escorts as part of Companions' 2002 gross receipts.[2] Neither point is persuasive.

"[W]hen reviewing a district court's application of the Sentencing Guidelines, we review legal questions *de novo* and we review any factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Chavez-Diaz*, 444 F.3d 1223, 1225 (10th Cir. 2006) (quotation omitted).

### 1. *Unclaimed Deductions*

Jodi Hoskins's 51-to-63 month sentencing guideline range was tied to the court's calculation that the government suffered a tax loss of more than $485,000. Hoskins disputes this figure and contends the court improperly failed to account for unclaimed deductions when estimating the government's tax loss. She argues the government's actual tax loss was less than $200,000.[3]

---

[2] Hoskins also argues that because she did not own Companions, she had no obligation to pay its taxes. Thus, she says, by signing the inaccurate tax return, she caused a tax loss of only $5,439.50—the tax break she received by filing jointly with Roy Hoskins, rather than individually. We need not address this argument here, given that once the district court established the § 7201 factors and convicted Hoskins, the question of tax loss addresses how much the government lost as a result of the inaccurate tax return. When Hoskins signed the 2002 tax return, she took responsibility for its contents. Moreover, we note that Hoskins was charged with attempting to evade Roy Hoskins's taxes—an allegation that takes into account the fact that she did not own Companions—and further that Hoskins did not file a separate, individual return for tax year 2002.

[3] In a criminal tax case, a defendant's base offense level under the USSG is 16 (27 to 33 months, assuming a criminal history category of III) if the tax loss

(continued...)

We may overturn the district court's tax-loss calculation only if it was clearly erroneous. *See United States v. Spencer*, 178 F.3d 1365, 1367 (10th Cir. 1999). Under this deferential standard, "for us to disturb the district court's factual finding as clearly erroneous, we would have to conclude the finding lacks factual support in the record, or, after reviewing all the evidence, we would need the definite and firm conviction that a mistake has been made." *United States v. Martinez*, 512 F.3d 1268, 1276 (10th Cir. 2008) (quotations omitted). We defer to interpretations of the Guidelines by the Sentencing Commission as important instructions from an authoritative source. *See United States v. Wise*, 597 F.3d 1141, 1148 n.6 (10th Cir. 2010) ("Commentary interpreting the sentencing guidelines is binding on the federal courts unless it violates the Constitution or a federal statute, or is inconsistent with the guideline it interprets.") (quotation omitted).

The USSG defines "tax loss" for the purpose of sentencing defendants convicted under § 7201:

> If the offense involved tax evasion or a fraudulent or false return, statement, or other document, the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed).

---

[3](...continued) was between $80,000 and $200,000, 18 (33 to 41 months) if it was between $200,000 and $400,000, and 20 if it was between $400,000 and $1 million (41 to 51 months). USSG §§ 2T4.1(F)–(H).

USSG § 2T1.1(c)(1). The notes to § 2T1.1 instruct courts that tax loss "shall be treated as equal to 28% of the unreported gross income . . . , *unless a more accurate determination of the tax loss can be made*." *Id.* § 2T1.1(c)(1), Note (A) (emphasis added). "[A]lthough the government bears the burden at sentencing of proving the amount of tax loss flowing from the defendant's illegal acts, neither the government nor the court has an obligation to calculate the tax loss with certainty or precision." *United States v. Sullivan*, 255 F.3d 1256, 1263 (10th Cir. 2001) (quotation omitted). In other words, the Guidelines establish a simple-to-calculate presumptive tax loss linked to gross income and a set tax rate; this presumptive amount will be applied unless a more accurate determination can be made by the court.

The question remains: what evidence can be marshaled to demonstrate a "more accurate determination of the tax loss"?[4] USSG § 2T1.1(c)(1), Note (A). Here, 28% of Hoskins's more than $1.2 million of unreported gross income was approximately $336,000, but both parties proposed more accurate determinations of the tax loss. The government introduced evidence showing that Hoskins's tax

---

[4] We address the issue because the government argues the district court erred in considering Hoskins's unclaimed deductions. Conversely, Hoskins contends the court erred in rejecting her proffered evidence of additional deductions. Thus, both parties contest some aspect of the district court's judgment on this score. It is well within our proper judicial role to vindicate a district court's judgment as written.

evasion resulted in an actual tax loss of $485,443.[5] It arrived at this number by estimating that cash receipts were equal to credit-card receipts, and then accounting only for the deductions included on the 2002 return filed by the Hoskinses. This estimate was supported by testimony from Companions' employees and governmental agents.

To counter this evidence, Hoskins prepared a tax return including unclaimed deductions she could have claimed on the 2002 return, but did not. This return, which indicated a tax loss of only $160,202,[6] was premised on Hoskins's estimation that more than 60% of Companions' gross receipts, including those from unreported cash, were deductible commission payments given to the escorts. The district court appropriately considered, but ultimately rejected, Hoskins's claim that her gross income should be adjusted downward.

Before the district court and on appeal, the government objects to the use of unclaimed deductions for purposes of the tax-loss calculation. It points to dicta from our decision in *United States v. Spencer*, 178 F.3d at 1368, where we

---

[5] The difference between the $336,000 and $485,443 figures is consequential, because if the district court used the lower figure, Hoskins's base offense level would have been 18. Since the court credited the government's evidence, however, her base offense level was 20.

[6] Hoskins sets forth this amount in her briefs before us. She proposed a different amount—$179,466—in her written objections to the PSR. The record and briefs do not reveal the source of the discrepancy. But it is ultimately of no consequence, given that any tax loss between $80,000 and $200,000 has the same effect under the USSG.

discussed the scope of USSG § 2T1.1. In that case, we stated that § 2T1.1 Note

(A)'s "more accurate determination" provision does not allow taxpayers "a second

opportunity to claim deductions after having been convicted of tax fraud." *Id.*

We explained that in calculating tax loss for the purpose of sentencing, "we are

not computing an individual's tax liability as is done in a traditional audit[, but

r]ather we are merely assessing the tax loss resulting from the manner in which

the defendant chose to complete his income tax returns." *Id.* Under this logic,

the defendant is stuck with all the upside income, but can claim none of the

downside adjustments.[7] Ultimately, however, we were persuaded that the

defendant failed to establish an entitlement to any of the unclaimed deductions.[8]

_____

[7] *Spencer's* logic has been adopted by a number of other circuits. *See, e.g.*, *United States v. Yip*, 592 F.3d 1035, 1041 (9th Cir. 2010); *United States v. Clarke*, 562 F.3d 1158, 1164 (11th Cir. 2009); *United States v. Delfino*, 510 F.3d 468, 473 (4th Cir. 2007); *United States v. Phelps*, 478 F.3d 680, 682 (5th Cir. 2007); *United States v. Chavin*, 316 F.3d 666, 679 (7th Cir. 2002); *United States v. Sherman*, 372 F. App'x 668, 676–77 (8th Cir. 2010); *see also United States v. Blevins*, 542 F.3d 1200, 1203 (8th Cir. 2008) (declining to decide "whether an unclaimed tax benefit may *ever* offset tax loss" but finding the district court properly declined to reduce tax loss based on taxpayers' unclaimed deductions (emphasis added)). *But see United States v. Gordon*, 291 F.3d 181, 187 (2d Cir. 2002) ("[T]he district court erred when it refused to consider any potential unclaimed deductions in its sentencing analysis."); Comment, *Tax Loss Calculation Under United States Sentencing Guidelines Section 2T1.1: Should Courts Account for Legitimate But Unclaimed Deductions When Calculating a Defendant's Sentence?*, 34 Sw. U. L. Rev. 527 (2005) (discussing merits of allowing consideration of legitimate unclaimed deductions).

[8] Even though we discussed in *Spencer* whether district courts may account for unclaimed deductions when calculating tax loss, we ultimately rejected the defendant's tax-loss estimate because it was not supported by a "scintilla of

(continued...)

-14-

We therefore did not hold squarely that unclaimed deductions can never be considered by the district court.

We likewise refuse to do so here. Although a bright-line rule forbidding after-the-fact consideration of unclaimed deductions is appealing and easily administrable, the plain language of § 2T1.1 does not categorically prevent a court from considering unclaimed deductions in its sentencing analysis. Instead, § 2T1.1 directs courts to calculate the tax loss that was the "object of the offense"—"the loss that would have resulted had the offense been successfully completed." Thus, the "object of the offense" refers to the "amount by which [a defendant] underreported and fraudulently stated his tax liability on his return." *United States v. Chavin*, 316 F.3d 666, 677 (7th Cir. 2002). Interpreting this language, some other circuits have held § 2T1.1's language requires courts to calculate only the tax loss the defendant *intended* when he or she filed the fraudulent return—and not the *actual* tax loss suffered by the government. *See, e.g.*, *id.* (explaining that "object of the offense" means "the *attempted* or *intended* loss rather than the *actual* loss to the government"); *United States v. Delfino*, 510 F.3d 468, 473 (4th Cir. 2007) (holding "tax loss" refers to the "intended loss to

[8](...continued)
competent evidence." 178 F.3d at 1369. We explained the defendant's "post hoc self-serving characterization" of the purported deductions was insufficient. *Id.* Thus, Hoskins is correct that *Spencer* did not prevent the district court from accepting a tax-loss estimate that accounted for unclaimed deductions. At oral argument, the government conceded the language in *Spencer* was dicta, but it nevertheless asks us to adopt *Spencer*'s reasoning.

the Government"). These circuits take this logic a step further and conclude that the concept of intended tax loss categorically does not allow for consideration of unclaimed deductions. We disagree.

Even if we accept that § 2T1.1 is directed at intended rather than actual tax loss, it does not follow that in proposing a more accurate determination, a defendant may *never* benefit from deductions that he could have claimed on the false tax returns. We, of course, agree with *Spencer* and other circuits that where a defendant offers weak support for a tax-loss estimate, nothing in the Guidelines *requires* a sentencing court to engage in the "nebulous and potentially complex exercise of speculating about unclaimed deductions." *United States v. Yip*, 592 F.3d 1035, 1041 (9th Cir. 2010). But where defendant offers convincing proof—where the court's exercise is neither nebulous nor complex—nothing in the Guidelines *prohibits* a sentencing court from considering evidence of unclaimed deductions in analyzing a defendant's estimate of the tax loss suffered by the government.[9] Indeed, a defendant (as well as the government, as happened

---

[9] We must emphasize, however, that § 2T1.1 does not permit a defendant to benefit from deductions unrelated to the offense at issue. For example, in this case, the district court would have been permitted to consider Hoskins's evidence of commission payments to escorts, but the Guidelines would not allow her to account for unclaimed deductions for peripheral expenditures unrelated to Companions. *See Yip*, 592 F.3d at 1040 ("[D]eductions are not permissible if they are unintentionally created or are unrelated to the tax violation, because such deductions are not part of the 'object of the offense' or intended loss."). Thus, unclaimed deductions for student loan interest or solar energy credits, for example, are not considered because they do not relate to the "object of the

(continued...)

-16-

here) may be able to persuade a court that a revised calculation more accurately states the underlying tax loss that should be applicable to a defendant's conduct. In those cases, a court may exercise its discretion to consider additional evidence that could guide its findings on the losses to the government relevant to sentencing.[10]

A hypothetical helps explain why consideration of unclaimed deductions may be appropriate, even if § 2T1.1 addresses only intended tax loss. Assume a restaurant owner is convicted of criminal tax evasion for failing to report or pay taxes on $100,000 income earned from his cash-only business. Let us also assume the restaurant paid $80,000 in tax-deductible business expenses, all in cash. And finally, let us assume the restaurant owner, despite evading his tax-filing responsibilities, maintained immaculate business records documenting every business expense. Assuming a 30% tax rate, if a court refused to consider the deductions under § 2T1.1, the restaurant owner would have caused a $30,000

---

[9](...continued)
offense" and are not relevant to restitution or guideline calculations for sentencing purposes.

[10] The Application Notes to § 2T1.1 provide further support. They require "tax loss" to be "determined by the same rules applicable in determining any other sentencing factor." USSG § 2T1.1, Application Note 1. Accordingly, in circumstances where the "amount of tax loss may be uncertain," a court may "simply make a reasonable estimate *based on the available facts*." *Id.* (emphasis added). Moreover, in "determining the tax loss attributable to the offense, the court should use as many methods set forth in subsection (c) and this commentary as are necessary given the circumstances of the particular case." *Id.*

tax loss. If the court did consider the deductions, the government's tax loss would have been only $6,000. We then ask, which of these two tax losses did the defendant *intend*?

The most logical conclusion is that the defendant sought to avoid paying what he legally owed in taxes: $6,000. It would never have occurred to the hypothetical defendant or his accountant that he would be cheating the government out of $30,000. Indeed, it is somewhat odd to frame the § 2T1.1 analysis in terms of intended tax loss—when in reality, a tax-evading individual seeks only to avoid paying taxes, not cause any specific loss to the government. Thus, if our hypothetical defendant presented his meticulously kept business records to the sentencing court, we believe the court could conclude reasonably that he "intended" a tax loss of only $6,000. This conclusion is bolstered by the notes to § 2T1.1, which explain that when the offense involves "failure to file a tax return, the tax loss is the amount of tax that the taxpayer owed and did not pay." USSG § 2T1.1 Note (2).

Moreover, the government is not supposed to reap windfall gains as a result of tax evasion. *See United States v. Gordon*, 291 F.3d 181, 187 (2d Cir. 2002) ("Tax loss under § 2T1.1 is intended to reflect the revenue loss to the government from the defendant's behavior."); USSG § 2T1.1 Application Notes ("[A] greater tax loss is obviously more harmful to the treasury . . . ."). Indeed, the government cannot claim to have lost revenue it never would have collected had

the defendant not evaded his taxes. For the purposes of calculating sentencing and restitution, courts consider "the loss that would have resulted had the offense been successfully completed." USSG § 2T1.1. Had our hypothetical defendant's offense been completed successfully, he would have avoided $6,000 in taxes, and the government would have suffered a $6,000 tax loss. The government would of course be permitted to present evidence showing that it in fact suffered a greater tax loss. Under § 2T1.1, it is firmly within the court's discretion to decide which party is correct. But the Guidelines do not require courts to base their sentencing analysis on unadjusted gross receipts figures untethered to actual taxes to which the government was entitled, but did not receive as a result of tax evasion.

In reaching this conclusion, we recognize that tax deductions are neither matters of right nor equity but rather of legislative grace. Individuals must report all income in their tax filings, but nothing requires them to claim deductions to which they are legally entitled. At the same time, however, this is not a sufficient reason to foreclose defendants from *ever* benefitting from unclaimed deductions. A defendant may well be able to persuade a court that, given his tax-filing practices, he would have claimed deductions on the unreported income; and of course, the government could counter by raising doubts. But these are evidentiary inquiries, and nothing in the Guidelines prevents courts from entertaining arguments on both sides.

We also note that our interpretation comports with the evolution of § 2T1.1's language. The 1991 version of § 2T1.1, which was superseded by the provision at issue here, required courts to calculate tax loss based on *gross* income and prohibited consideration of legitimate but unclaimed deductions. The 1991 Guidelines thus established an "alternative minimum standard for the tax loss" which made "irrelevant the issue of whether the taxpayer was entitled to offsetting adjustments that he failed to claim." USSG § 2T1.1 Note (4) (1991). "This rough-and-ready calculation applie[d] the highest marginal rate to the amount of concealed income, disregarding deductions that would have been available had the taxpayer filed an honest return." *United States v. Harvey*, 996 F.2d 919, 920 (7th Cir. 1993). When the Sentencing Commission amended the Guidelines in 1993, however, it deleted its rule explicitly foreclosing consideration of unclaimed offsetting adjustments. Accordingly, as the Second Circuit has explained, "[b]ecause the [Amended] Guideline permits consideration of legitimate but unclaimed deductions, it tends to produce smaller figures than the 1991 guidelines," which does not permit such consideration. *United States v. Martinez-Rios*, 143 F.3d 662, 671 (2d Cir. 1998) ("In contrast [to the 1991 Guidelines], the 1995 Guidelines . . . do not foreclose consideration of legitimate but unclaimed deductions."). Finally, it is worth noting that if the Commission intended a categorical ban on unclaimed deductions, it chose odd language to accomplish that task.

Applying these principles to the present case, we find the district court reasonably determined the government's upward tax-loss calculation was credible and adopted it. Testimony supported the government's contention that at least 50% of Companions' gross receipts were from cash transactions; in fact, one Companions employee estimated that "65 to 70 percent [of customers] would pay cash." R., Vol. I at 146. Accordingly, we cannot take issue with the district court's finding that Hoskins underreported Companions' gross receipts by more than $1.2 million. Additionally, the government argued persuasively at sentencing that the 2002 tax return filed by the Hoskinses may have incorporated all deductions to which they were entitled—not just those associated with Companions' credit-card receipts. Thus, the district court's finding that the government suffered a $485,443 tax loss was not clearly erroneous.

Finally, the district court had many reasons to be skeptical of Hoskins's proposed deductions. Most importantly, because Jodi Hoskins introduced no credible evidence from 2002 showing that any deductions were unclaimed, it is possible that on their 2002 return, Roy and Jodi Hoskins reported *all* deductions—stemming from cash *and* credit-card receipts—while reporting only less than half of their gross receipts. Hoskins gave the court no good reason to retroactively credit other unclaimed deductions. Indeed, the projected deductions Hoskins proposed were based on marginally relevant information tied to a two-month period in 2007 and 2008. The record contains no evidence suggesting the

2007–2008 period was closely representative of the situation in 2002, or that the two-month period was chosen randomly. In addition, the proposed return was self serving, given that Jodi and Roy Hoskins personally supplied the data their accountant used to make their tax-loss estimate. Finally, because not all the sources supporting the proposed return were in the record and, in any event, did not specify individual 2002 transactions, it was impossible for the court or the government to independently verify the proposed figures.

In sum, the district court did not err in considering additional evidence regarding the accuracy of the tax loss calculation. Nor did it err in accepting the government's tax-loss estimate and declining to consider Hoskins's proposed tax calculations.

### 2. Calculation of Gross Receipts

Hoskins also argues the government's calculation of more than $1.2 million of unreported income is too high because it incorporates the escorts' tip income and cash commissions as part of *the company's* gross receipts. Hoskins does not dispute that at least half of the escorts' services were paid in cash, but she contends the company never actually received the escorts' shares of cash transactions, which included commission payments and tip income. Thus, she says the tips and escort commissions should not be incorporated as part of Companions' receipts.

To grasp this argument, one must understand Companions' business model. In exchange for a date with a Companions escort, customers were required to pay an hourly fee—which Companions and the escort would share—and in most cases customers paid the escort a tip as well. Hoskins provides an illustrative example of how this operated in practice. Assuming a one-hour date, the agency fee would be $150; of this, the escort was entitled to retain $70, and Companions kept the remaining $80. Assuming the escort also received a $100 tip, the escort would receive a total of $170, and Companions would receive only $80. Hoskins contends that for cash transactions, customers paid the escorts directly, and Companions never actually received anything but its share of the agency fee—$80 in Hoskins's example. Thus, Hoskins says she should only have been taxed for the amount Companions actually received—and not for the larger figure including the escorts' tips and commission payments.

In total, the accountant retained by the Hoskinses testified that escorts kept 63.45% of the cash they took in, and that they took home 61% of credit-card income. The accountant used these figures to calculate unclaimed deductions, but Hoskins also deploys them to call into question the district court's gross-receipts calculation. Indeed, according to Hoskins, although the government was not wrong to estimate that cash transactions equaled credit-card receipts, it should not have doubled the $1,053,952 credit-card receipt figure to arrive at the additional taxable income arising from cash transactions. Rather, the argument follows, the

-23-

credit-card figure should have been multiplied by 36.55%, yielding gross cash receipts of $385,182 and a total tax loss of less than $200,000.

Because Hoskins advances this argument for the first time on appeal, we review only for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Poe*, 556 F.3d 1113, 1128 (10th Cir. 2009). Under plain error review, we may not reverse unless we find "(1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, [we] may then exercise [] discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Balderama-Iribe*, 490 F.3d 1199, 1203–04 (10th Cir. 2007) (quotation omitted). Hoskins bears the burden of demonstrating plain error. *Id.*

As an initial matter, we find the district court did not err when it included escorts' commission payments in Companions' gross income. By statute, "gross income" includes "all income from whatever source derived." *See* 26 U.S.C. § 61(a). Recognizing this, we have explained that "the 'sweeping scope' of this [gross income] section . . . has been repeatedly emphasized by the Supreme Court," and "any gain constitutes gross income unless the taxpayer demonstrates that it falls within a specific exemption." *Brabson v. United States*, 73 F.3d 1040, 1042 (10th Cir. 1996) (quotations omitted). Given this expansive definition, we have no reason to doubt the district court's conclusion that commission payments to escorts were part of Companions' gross income—regardless of the arrangement

-24-

the company had with its escorts. Of course, Hoskins could have claimed deductions for cash commission payments to escorts, but as explained above, the district court did not err in refusing to account for her proposed unclaimed deductions in calculating the government's tax loss. Moreover, it is telling that Hoskins cites no authority stating that commissions that are collected and kept by a business's agents do not constitute gross income to the business. *See United States v. Baum*, 555 F.3d 1129, 1136 (10th Cir. 2009) ("When no authority from the Supreme Court or this circuit would compel a determination that there was error and there is contrary authority in other circuits, the error can rarely be plain.")

Whether the district court improperly accounted for tip receipts when calculating tax loss is a more challenging question. To the extent escorts received tips, this money was remuneration for employment and not gross income attributable to Companions.[11] *See* 26 U.S.C. § 3121(q) ("[T]ips received by an employee in the course of his employment shall be considered remuneration for such employment."); *see also id.* § 3121(12) (tips are considered part of an employee's wages and not a company's income). Accordingly, because tips are not income, any portion of Companions' unreported receipts derived from tips should not have been included in the company's total gross income.

---

[11] We note, however, that Companions was required to withhold employee income and Social Security tax from tip income reported, and it was required to pay payroll taxes on its escorts' tip income. *See* 26 U.S.C. §§ 3121(a) and 6053.

-25-

The problem, however, is that Hoskins did not raise this argument before the district court, and thus there is a minimal factual record elucidating the amount of tips received by Companions' escorts. We know that tipping escorts was commonplace, but we know little else. For example, we do not know the average tip size, or how often customers paying with credit cards included the tips in their credit-card payments instead of tipping in cash. Without knowing these facts and others, we cannot estimate how much, if any, of the $1.2 million unreported-income figure was derived from tips. We can envision scenarios where little or none of the unreported income was tip-based. For example, if nearly all credit-card customers tipped in cash, then doubling the total credit-card receipts would yield a reasonable estimate of gross income from cash transactions. Further, as the government notes, the record does not indicate whether tips constituted a sufficiently large portion of Companions' unclaimed income such that the tax loss would be pushed below $400,000—a threshold figure under the Guidelines. We simply do not know. And because of that—and because the government had no impetus to develop the record on this point before the district court—we cannot say the district court plainly erred in accepting the government's tax-loss calculation.

Moreover, even if she could demonstrate error that was plain, Hoskins cannot establish prejudice. "Under the plain error standard, we reverse only when . . . there is a reasonable probability that, but for the error claimed, the result of

-26-

the proceeding would have been different." *United States v. Mendoza*, 543 F.3d 1186, 1194 (10th Cir. 2008). Hoskins's sentencing range under the Guidelines was 51 to 63 months. Even if the court had calculated her tax loss to be less than $200,000, however, Hoskins's sentencing range would have been 33 to 41 months. Because the court's sentence of 36 months was within this lower range, we find no prejudice.

In sum, Hoskins has not satisfied any of the prongs of plain error review.

**C. Sentencing**

Finally, Hoskins challenges the district court's sentencing enhancement for failing to report sources of income derived from criminal activity. Under USSG § 2T1.1(b)(1), "[i]f the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity, [the offense level is] increase[d] by 2 levels." The district court made a factual finding that more than $10,000 of Hoskins's unreported income (less than 1%) arose from illegal activity—specifically, prostitution. We review this finding for clear error. *Chavez-Diaz*, 444 F.3d at 1225.

Contrary to Hoskins's assertion, the court's factual finding was based on ample evidence in the record. Indeed, the court heard testimony that Companions' escorts engaged in sex acts as a matter of common practice. In this regard, a witness stated that Companions referred to escorts as "liberal" who were known to engage in sex acts with clients [*See id.*; *see also* R., Vol. II, at 683.],

and that Hoskins would have been "naive" not to know the escorts engaged in prostitution.  R., Vol. I at 329.

The district court appropriately found these facts and others established by a preponderance of the evidence that more than $10,000 of Hoskins's unreported income derived from criminal activity.  This finding was not clearly erroneous.

## IV.  Conclusion

For the reasons discussed above, we AFFIRM Hoskins's conviction and sentence.  In reaching this conclusion, we find that under USSG § 2T1.1, a sentencing court analyzing the tax loss suffered by the government may consider evidence of a defendant's unclaimed deductions.

10-4131, <u>United States v. Jodi Hoskins</u>

**BRISCOE**, Chief Judge, concurring in part and dissenting in part.


I join the portions of the majority's opinion affirming Hoskins's conviction, the district court's ultimate finding regarding the amount of the tax loss, and the district court's application of the U.S.S.G. § 2T1.1(b)(1) enhancement. I respectfully dissent from the portion of the opinion in which the majority takes the unnecessary step in announcing a rule permitting defendants in future cases to offer deductions they did not actually claim in order to establish "a more accurate determination of the tax loss" under U.S.S.G. § 2T1.1(a). We are not called upon in this case to reach this issue and, as a consequence, I would not reach it. Further, if required to reach it, I would side with our own prior precedent and the vast majority of our sister circuits who have addressed the issue.

I agree with the majority's conclusion that the district court did not err when it accepted the government's evidence regarding tax loss, and that this determination is sufficient to uphold the calculation of Hoskins's base offense level.[1] The majority then discusses the hypothetical case in which a defendant

---

[1] The majority addresses the issue because the government argues that the district court erred in considering Hoskins's unclaimed deductions. <u>See</u> Op. at 12 n.4. The fact that a party raises an alternative argument does not mean we are bound to address it. In this case, the government argued both that a defendant cannot point to unclaimed deductions and that "even if it were legally possible, under some circumstances, for a criminal defendant to take advantage of hypothetical, unclaimed deductions at sentencing, the district court in this case

(continued...)

somehow offers "convincing proof" of the tax return she would have filed had she known that she would later be caught and prosecuted for tax evasion. See Op. at 16. Because the answer to the more abstract question presented "makes no difference to the outcome of the case before us . . . we need not and [should] not decide it." Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd., 616 F.3d 1086, 1095 (10th Cir. 2010). "Judicial restraint, after all, usually means answering only the questions we must, not those we can." Id. at 1094. However, because the majority chooses to discuss it, I write to express my disagreement with a rule that will, in my view, greatly and improperly complicate sentencing in tax cases. I would adhere to our prior statements in United States v. Spencer, 178 F.3d 1365 (10th Cir. 1999), and reiterate that a defendant may not attempt to adjust the amount of the tax loss by proposing deductions that she did not actually claim at the time the fraudulent tax return was filed.

The majority views our discussion in Spencer, where we reject a defendant's entitlement to retroactive deductions when computing § 2T1.1(a) tax loss, as dictum. I do not think the discussion in Spencer can be so readily ignored. In Spencer, we noted that the Second Circuit had recently held that defendants could "employ 'legitimate but unclaimed deductions' in calculating

---

[1](...continued)
did not err—much less clearly err—when it evaluated the evidence and found that Hoskins's tax loss was more than $400,000." Aple. Br. at 15; see also Aple. Br. at 20-23.

tax loss," but "[w]e question[ed] this conclusion." Id. at 1368 (quoting United

States v. Martinez-Rios, 143 F.3d 662, 671 (2d Cir. 1998)). We then specifically

rejected the interpretation of the phrase "a more accurate determination of the tax

loss" which is now adopted by the majority:

> The sentencing guidelines simply authorize a court to avoid the
> presumptive tax rates if a "more accurate determination of the tax
> loss can be made." We do not interpret [U.S.S.G § 2T1.1(c) Note
> (A)] as giving taxpayers a second opportunity to claim deductions
> after having been convicted of tax fraud. It must be remembered
> that, in tax loss calculations under the sentencing guidelines, we are
> not computing an individual's tax liability as is done in a traditional
> audit. Rather, we are merely assessing the tax loss resulting from the
> manner in which the defendant chose to complete his income tax
> returns.

Id. (citation omitted). Although this statement was an alternative basis upon

which to affirm the district court's ruling because there was no evidence to

support the defendant's proposed deductions, id. at 1369, the statement is a clear

rejection of the rule the majority now advances.[2] "Alternative rationales such as

---

[2] The majority relies on the government's concession at oral argument in
Roy Hoskins's case. See Op. at 15 n.8 (discussing the government's concession
that the language in Spencer was dicta). First, I note that a party's interpretation
of our prior rulings is not determinative. Cf. U.S. Nat'l Bank of Or. v. Indep. Ins.
Agents of Am., Inc., 508 U.S. 439, 447 (1993) ("[T]he Court of Appeals acted
without any impropriety in refusing to accept what in effect was a stipulation on a
question of law."); United States v. Charles, 576 F.3d 1060, 1066 (10th Cir. 2009)
("[T]he government's concession is not dispositive because a party's position in a
case . . . does not dictate the meaning of a federal law." (internal quotation
omitted)). Second, I think the majority misstates the government's position. The
government in its brief repeatedly cites Spencer and treats our rejection of the
very tax-loss argument Hoskins is now making, not as dictum, but as a holding of
(continued...)

this, providing as they do further grounds for the Court's disposition, ordinarily cannot be written off as dicta." Surefoot LC v. Sure Foot Corp., 531 F.3d 1236, 1243 (10th Cir. 2008).

The goal of a tax loss calculation is to assess the tax loss "resulting from the manner in which the defendant chose to complete his tax returns." Spencer, 178 F.3d at 1368. The scope of a defendant's tax evasion is determined at the point at which the return is filed, not after the defendant is charged and convicted. The majority's statement that "the government is not supposed to reap windfall gains as a result of tax evasion," Op. at 18, has no bearing on the instant issue, where we are asked to determine tax loss based on the tax return the defendant actually filed. The tax loss embodied in the fraudulent return is not necessarily the amount that the government actually lost in revenue or the amount that the defendant could ultimately be ordered to pay, because "[t]he tax loss is not reduced by any payment of the tax subsequent to the commission of the offense." U.S.S.G. § 2T.1.1(c)(5). Surely if § 2T1.1 tax loss cannot be reduced

---

[2](...continued)
the case. See Aple. Br. at 8, 16 ("In United States v. Spencer, this Court expressly rejected the argument Hoksins now makes."), 17 ("Hoskins attempts to escape Spencer's holding . . . ."), 17-18 ("Spencer holds that 'the total amount that was the object of the offense' must be calculated based on what the defendant . . . actually did, not what they could have done or might have done."), 18 ("[T]his Court's holding in Spencer was not limited to its statement that there was no 'competent evidence' in the record that would allow a 'more accurate determination of the tax loss to be made.'").

by the defendant's subsequent payment of taxes, § 2T1.1 tax loss cannot be reduced by unclaimed deductions proffered in an unfiled return after conviction.

Five other circuits have also concluded that a defendant cannot reduce the U.S.S.G. § 2T1.1 tax loss with unclaimed deductions. See United States v. Yip, 592 F.3d 1035, 1041 (9th Cir. 2010) ("We hold that § 2T1.1 does not entitle a defendant to reduce the tax loss charged to him by the amount of potentially legitimate, but unclaimed, deductions even if those deductions are related to the offense."); United States v. Phelps, 478 F.3d 680, 682 (5th Cir. 2007) (per curiam) (holding that the defendant could not reduce the tax loss by taking a social security tax deduction that he did not claim on the false return); United States v. Delfino, 510 F.3d 468, 473 (4th Cir. 2007) ("The law simply does not require the district court to engage in [speculation as to what deductions would have been allowed], nor does it entitle the Delfinos to the benefit of deductions they might have claimed now that they stand convicted of tax evasion."); United States v. Chavin, 316 F.3d 666, 678 (7th Cir. 2002) (holding that the definition of tax loss "excludes consideration of unclaimed deductions"); see also United States v. Clarke, 562 F.3d 1158, 1164 (11th Cir. 2009) (holding that the defendant was not entitled to have the tax loss calculated based on a filing status other than the one he actually used and that "[t]he district court did not err in computing the tax loss based on the fraudulent return Clarke actually filed, and not on the tax return Clarke could have filed but did not").

The reasoning of these cases from our sister circuits is sound. The majority's ruling essentially allows the defendant a "do over" by permitting the defendant, after conviction, to prepare a hypothetical, substitute return which minimizes the defendant's hypothetical tax liability. The fact that the defendant might have done things differently had she known she would be caught does not alter what she actually did, which was file a return without the deductions now proposed.[3] Thus, the unclaimed deductions were not part of "the manner in which the defendant chose to complete [her] tax returns." Spencer, 178 F.3d at 1368; see also Chavin, 316 F.3d at 678 ("[T]he defendants' intention is embodied in the tax return that was filed with the IRS."). When affirming Hoskins's conviction for tax evasion in violation of 26 U.S.C. § 7201, the majority concludes that Hoskins's signature on the false return was the affirmative act of tax evasion for which "she cannot now escape criminal liability." Op. at 9. However, when reviewing the sentence imposed for this criminal act, the majority shifts gears and permits an after-the-fact "do over," by concluding we should consider for sentencing purposes a hypothetical tax return that did not serve as the basis for

---

[3] Further, the majority's approach would permit a defendant to claim deductions to which she is no longer entitled because the time period for amending her tax return has expired. The majority states that Hoskins offered hypothetical tax returns in this case because "it was too late to submit amended returns to the IRS." Op. at 2. It was too late because the Hoskinses did not choose to file timely amended or truthful returns.

-6-

her criminal conviction.  The majority's new rule would allow a defendant to escape the full consequences of the return the defendant chose to file.

The majority's decision is based in part on the idea that, at the time the false return was filed, the defendant legally owed a certain amount of taxes which included unclaimed deductions.  This is a fiction; deductions do not reduce one's tax liability unless they are actually claimed.  Equally as troubling, the majority's rule invites defendants to turn a sentencing hearing into a tax audit and the district court into a tax court tasked with determining whether the deductions proposed at sentencing would have been viable when the defendant's return was actually filed.  See Martinez-Rios, 143 F.3d at 670 (criticizing a regime requiring courts to consider unclaimed deductions because it would oblige "a sentencing judge . . . to make a precise determination of tax liabilities, resolving issues normally determined in administrative proceedings of the Internal Revenue Service, sometimes subject to civil litigation").

The majority also bases its ruling on the evolution of § 2T1.1's language. My reading of that evolution does not comport with the majority's.  The previous version of the guideline defined tax loss as "the greater of: (A) the total amount of tax that the taxpayer evaded or attempted to evade; and (B) the "tax loss" defined in §2T1.3."  In turn, § 2T1.3 defined tax loss as "28 percent of the amount by which the greater of gross income and taxable income was understated, plus 100 percent of the total amount of any false credits claimed against tax."

-7-

The gross income-based calculation was an alternative method of calculating tax loss. The application notes to this previous version of §2T1.1 stated: "The guideline refers to § 2T1.3 to provide an alternative minimum standard for the tax loss, which is based on a percentage of the dollar amounts of certain misstatements made in returns filed by the taxpayer. This alternative standard may be easier to determine, and should make irrelevant the issue of whether the taxpayer was entitled to offsetting adjustments that he failed to claim."

In 1993, the Sentencing Commission changed the definition of tax loss to "the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)." The Commission also deleted the application note discussed above. The note was deleted because it was no longer relevant, not in order to "delete[ the] rule explicitly foreclosing consideration of unclaimed offsetting adjustments," Op. at 20. See Yip, 592 F.3d at 1041. I would conclude that the change in language supports a determination that the tax loss that was the "object of the offense" is something other than the minimum amount of tax that the defendant possibly could have owed at the time. The old language, "[t]he total amount of tax that the taxpayer evaded or attempted to evade," sounds more like actual government revenue loss than "the amount of loss that was the object of the offense." See Chavin, 316 F.3d at 678 (finding it plausible that the application note was deleted "because the new tax-loss definition specifically excludes consideration of

-8-

unclaimed deductions on its face by defining tax loss as 'the object of the offense.'").  Further, I note that in the 1993 amendments the Commission also adopted a revised tax loss table "to provide increased deterrence for tax offenses." U.S.S.G. App. C, Amendment 492.  The majority's interpretation cuts against the goal of greater deterrence for tax offenses because it will greatly reduce the sentencing range for defendants who could have taken deductions if they had filed truthful tax returns.

Finally, I am puzzled by footnote nine of the majority's opinion, which "emphasize[s] . . . that § 2T1.1 does not permit a defendant to benefit from deductions unrelated to the offense at issue."  Op. at 16 n.9.  I fail to see why it should matter whether the unclaimed deductions are related to the offense or not.[4] In fact, it might make more sense to permit unrelated deductions precisely because they are unrelated to the offense and, thus, not part of the tax evasion scheme to be addressed at sentencing.  Cf. Clark v. United States, 211 F.2d 100, 103 (8th Cir. 1954) ("Some times the failure to claim deductions in a return may well be part of the taxpayer's scheme to cover up his unreported income as a matter of not creating suspicion on the face of his return.").  Once a district court begins entertaining hypothetical unclaimed deductions, it must inevitably attempt

---

[4]  Further, if the offense is willfully filing a false tax return, I fail to see how some unclaimed deductions would be related to the offense and some deductions would not be.  All the deductions relate to the tax return.

to calculate the government's actual revenue loss. Why stop at unclaimed deductions relating to the specific offense? If the goal is to determine what an honest, tax-minimizing taxpayer would have done to determine what tax was legally owed (which becomes the goal when the court entertains unclaimed deductions), I would think that courts would be compelled to consider all possible exemptions, deductions and tax credits.

For these reasons, I cannot join in the portion of the majority's opinion that permits defendants to proffer unclaimed deductions in order to reduce tax loss under U.S.S.G. § 2T1.1.