FILED
United States Court of Appeals
Tenth Circuit

October 21, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee/
Cross-Appellant,

v.

BILLY R. MELOT,

      Defendant - Appellant/
Cross-Appellee.

Nos. 10-2121 and 11-2195

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. 2:09-CR-02258-MCA-1)**

Gregory M. Acton, Albuquerque, New Mexico, for Defendant-Appellant/Cross-Appellee.

Mark S. Determan, Attorney, Department of Justice (Kenneth J. Gonzales, United States Attorney, Of Counsel; Kathryn Keneally, Assistant Attorney General; Frank P. Cihlar, Chief, Criminal Appeals & Tax Enforcement Policy Section; and Gregory Victor Davis, Attorney, Department of Justice, with him on the briefs), Washington, D.C., for Plaintiff-Appellee/Cross-Appellant.

Before **HOLMES**, **HOLLOWAY**, and **MURPHY**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I. Introduction

After a jury trial, appellant Bill Melot was convicted of one count of corruptly endeavoring to impede the administration of the Internal Revenue Code, one count of attempting to evade or defeat tax, six counts of willful failure to file, and seven counts of making false statements to the Department of Agriculture. Melot was sentenced to a term of sixty months' imprisonment, a significant downward variance from the advisory guidelines range of 210-262 months. He was also ordered to pay $18,493,098.51 in restitution to the Internal Revenue Service.

In this appeal, Melot argues the Government presented insufficient evidence of willfulness to support his convictions and erred in the calculation of the tax loss and the amount of restitution. The Government cross-appeals, arguing the district court committed clear error by applying a two-level reduction to Melot's offense level for acceptance of responsibility. Exercising jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291, this court **affirms** Melot's convictions and **reverses** his sentence.

## II. Background

On August 11, 2009, Melot was charged by indictment with one count of corruptly endeavoring to impede the administration of the Internal Revenue Code, in violation of 26 U.S.C. § 7212(a); one count of willfully attempting to evade the payment of taxes, in violation of 26 U.S.C. § 7201; six counts of willfully

failing to file a tax return, in violation of 26 U.S.C. § 7203; and seven counts of making a false statement to the Department of Agriculture, in violation of 15 U.S.C. § 714m(a). Melot pleaded not guilty and a four-day trial was held in April 2010. The Government presented evidence that Melot received income from various businesses and rental properties but ceased filing income tax returns after 1986[1] and did not pay any federal income taxes since at least 1984.

At trial, an IRS revenue agent testified she was assigned Melot's case in 1992. During her first meeting with Melot and his accountant, she asked Melot why he had not filed a 1987 income tax return and he responded that "he didn't know how to do it." She testified Melot did not disclose all of his business entities during their meeting, but her subsequent investigation showed that, during the relevant time period, Melot operated between seven and ten gas stations under the moniker Melot Oil Company. He deposited the receipts from the businesses into multiple bank accounts he opened in the names of nominee

---

[1]Melot last filed an individual income tax return for the 1986 tax year. The KLM Trust, an irrevocable trust established by Melot but over which he retained control, did not file tax returns for the years 1986 through 2008. Three additional trusts established by Melot—the MELM Trust, the ARM Trust, and the BRM Trust—also did not file tax returns. Corporate income tax returns were not filed for corporations established by Melot, including Cline Sales, Inc.; CD Express, Inc. (for all years but 1997); CD Properties; GEW, Inc.; Leigh Corporation; QF Marketing; and Suzanne Corporation. A government witness who audited Melot in 1992, testified he also did not file an IRS Form 720, which is applicable to fuel excise taxes.

entities.[2]  Melot established these entities and bank accounts using a false Social

Security number or a false employer identification number.  There was evidence

Melot deposited over $9.5 million in gross business receipts into these bank

accounts between 1999 and 2008.  Each deposit was in an amount less than

$10,000.  The revenue agent testified this behavior is known as "structuring" and

is done because a bank receiving a deposit of $10,000 or more is required to file a

currency transaction report with the IRS.[3]

The agent obtained, among other things, records showing transfers ranging

between $25,000 and $50,000 from Melot's domestic bank accounts to a Swiss

bank in the Bahamas.  She also uncovered large checks written to family

members or to cash.  Based on the books and records she obtained from Melot,

bank deposit records, and other sources, the revenue agent determined Melot

owed $253,260 in taxes for the tax year 1987; $430,464 for the tax year 1988;

$867,595 for the tax year 1989; $521,638 for the tax year 1990; $353,667 for the

---

[2]Melot told the revenue agent he personally prepared and made all the deposits himself.  He also admitted he maintained complete control over at least one bank account established in the name of his sister, Georgia Watson, and that his sister "didn't have anything to do with that particular account."

[3]The Government presented testimony indicating Melot was aware of this $10,000 threshold.  An employee at the bank where Melot and his wife maintained an account, testified she discussed the issue with Mrs. Melot in 1990. Based on Mrs. Melot's conduct, the witness stated she completed a suspicious transaction log to record Mrs. Melot's currency transactions that were below $10,000.  Another witness testified Melot engaged in similar behavior at the bank where she worked.  She also filed a suspicious activity report.

tax year 1991; $462,657 for the tax year 1992; and $633,667 for the tax year

1993.[4]

Once the audit was complete, Melot was notified of the proposed

assessment and given an opportunity to respond. Melot sent a letter to the IRS on

March 30, 1999, stating:

> Please be advised that I am a non-resident alien, American, of the
> United States, never having lived, worked, nor having income from
> any source within the District of Columbia, Puerto Rico, Virgin
> Islands, Guam, American Samoa, or any other territory within the
> United States which entity has its origin and jurisdiction from Article
> 1, Section 8, Clause 17 of the U.S. Constitution. Therefore I am a
> non-taxpayer outside of the venue and jurisdiction of the 26 USC.
> Please forward me a letter stating that I am not liable for these tax
> returns or provide me with a copy of the section numbers in 26 USC
> and 26 CFR requiring me to file the Form 1040.

The revenue agent testified that Melot's letter presented a frivolous tax argument

that was consistent with arguments made by so-called tax protestors. In response,

the IRS sent Melot a formal thirty-day notice, informing him of his right to a

conference with a regional office of appeals. Melot responded by sending a

second letter, stating:

> I do not owe the IRS any income taxes. I have incurred no tax
> liability for the Form 1040 individual income tax under Title 26,
> Subtitle A, during those years. Furthermore, I am not under your
> jurisdiction since I fall under the classification, quote, non-resident
> alien, unquote, under Title 26 CFR 111. I do not reside in
> Washington, DC, or in any other federal enclave in which the IRS
> has jurisdiction. I am not subject to the jurisdiction of the United

---

[4]These amounts did not include fees and penalties.

States.  It is a well established principle of law that all federal legislation applies only within the territorial jurisdiction of the United States unless a contrary intent appears.  Unquote.  *Foley Brothers versus Filardo*, 336 U.S. 281, in 1948. . . .  Please clear up your records for me.

Melot and the IRS exchanged additional correspondence but Melot did not follow the process for lodging a formal written protest to the assessment, file properly prepared tax returns for the years in question, or pay the assessed amount.

The Government also presented the testimony of an IRS field revenue officer whose job is to collect delinquent taxes remaining unpaid after a substitute-for-return assessment is made.  She testified the IRS sent a notice to Melot in September 2000 informing him that a federal tax lien would be filed one year later in October 2001.  She also stated the IRS seizes a taxpayer's property only as a last resort, "[a]fter all reasonable attempts have been made to try and work with the taxpayer."  She testified the IRS does not have the power to seize property unless it is in the taxpayer's name[5] and, therefore, a taxpayer can impede the collection of a tax liability by transferring property, titling property or opening banks accounts in the name of a nominee, opening foreign bank accounts, or recording false mortgages.  Melot's former employee testified that Melot told her he transferred assets to trusts and corporations "so it couldn't get tracked" by the government.  Another former employee testified Melot purchased some real

---

[5]The witness also testified the IRS can place a nominee lien on property.

property and had it titled in her name even though she provided none of the purchase price. Although the property was subsequently mortgaged for $525,000, she did not receive any money from the transaction. When this employee purchased a retail store from Melot, she made monthly payments to individuals named Porterfield and Watson, not to Melot.

There was also testimony Melot frequently used cash to operate his businesses. A government witness who worked for a company that supplied tobacco products, candy, and sundries to Melot's businesses described him as a "big customer" who made "large purchases." She also testified Melot, at one point, attempted to pay for the merchandise with cash instead of electronic funds transfer payments because he "didn't want the money going through his [bank] account." A former employee testified Melot paid his employees with a combination of cash and checks and advised them they were not required to pay taxes on the portion of their wages paid in cash. She also testified she never received a W-2. Melot admitted he paid his employees with cash but testified it was at their request. He asserted he filed W-2 forms for his employees.

The Government also presented testimony related to Melot's receipt of agricultural subsidies from the United States Department of Agriculture. Melot applied for, and received, subsidies in his individual name and in the name of the KLM Trust from 1996 through 2009. The payments totaled $226,526. As a prerequisite to receiving these funds, Melot was required to complete eligibility

and contract documents. The Government presented the documents completed by Melot indicating, in response to one question, that he is a United States citizen. On the forms, Melot also certified that the income information he provided was "consistent with the tax returns filed with the Internal Revenue Service." The application defined "adjusted gross income" as "the individual's or legal entity's IRS reported adjusted gross income." During the years at issue, however, Melot did not file a tax return or report any adjusted gross income to the IRS. He also provided the Department of Agriculture with a false Social Security number.

At trial, Melot did not dispute the allegations he failed to file tax returns or pay taxes. Instead, he defended the charges by asserting his actions were not willful and contesting the amount of tax owed. Melot testified in his defense that he believed he was not a citizen of the United States and, therefore, the tax laws did not apply to him and he did not owe any taxes. He also testified he transferred assets to irrevocable trusts because he believed trusts were not required to pay income taxes.[6] He asserted these beliefs were based on representations he read in tax-protestor literature that "somehow . . . came across [his] path" and "made sense" to him. Melot stated the literature made "a really good argument that wages are not income under the income tax laws." He

---

[6]Melot admitted his son was named trustee of an irrevocable trust known as the KLM Trust, but he made all the decisions related to the trust and retained the power to remove his son as trustee.

recalled the books also advised him he was not a citizen of the United States because he did not live in Washington, D.C., or a territory of the United States. He asserted during his direct examination that he no longer believed any of the tax-protestor literature on which he previously relied.

On cross-examination, Melot admitted he hired an accountant in 1985 and 1986 to prepare his tax returns. He further testified that after that date, he relied solely on the tax-protestor literature he purchased and never verified the information in that literature with an accountant. He conceded he periodically sought advice from accountants and lawyers after he read the literature but no accountant or other trained, licensed professional told him the federal income tax code was unconstitutional or that he did not have to pay income taxes on wages.

Melot also testified he believed he had no tax liability based on the number of exemptions he could claim and the amount of income he was making. He further testified that his motivation in forming multiple corporations was to limit his liability for accidents occurring on his property, not for tax purposes. He asserted the profits earned by the corporations were transferred to offshore banks because that was the only way to invest in foreign currency. Melot stated the corporations never filed corporate income tax returns because he "never did get around to that" even though he "shoulda got that done."

Melot admitted he knew the Social Security number appearing on his license was incorrect but stated he could not explain how it happened. He

testified he nevertheless continued to use the incorrect number because he "didn't think it mattered."[7] The false Social Security number was used to open multiple bank accounts. It was also used when Melot installed a credit card machine in his gas stations for the purpose of accepting credit card payments from customers. Melot testified he did not have "any idea" how an additional false Social Security number[8] was entered on Department of Agriculture farm subsidy forms, but acknowledged he probably provided the number to the "girls" who completed the forms for him. On cross-examination, Melot asserted he never read or reviewed any of the documents he submitted to the Department of Agriculture even though his initials and signature appeared on all of them. He denied using false Social Security numbers so the Internal Revenue Service could not find him or seize his assets.

The jury found Melot guilty of all the crimes charged. The district court sentenced him to sixty months' imprisonment, a significant downward variance from the advisory guidelines range of 210-262 months calculated by the district court. He was ordered to pay $18,493,098.51 in restitution to the Internal

---

[7]The IRS revenue agent auditing Melot's income tax returns testified she discovered the Social Security number on Melot's driver's license was incorrect in August 1992, when she was assisting him in obtaining information about a contemporaneous excise tax audit. She further testified Melot admitted, at that time, that the Social Security number on his license was incorrect.

[8]The Social Security number Melot provided to the United States Department of Agriculture was neither his true Social Security number nor the false one on his driver's license.

-10-

Revenue Service and $226,526 in restitution to the United States Department of Agriculture.  In this appeal, Melot raises challenges to his convictions and his sentence.

## III.   Discussion

### A.  Convictions

Melot challenges the sufficiency of the evidence presented by the Government to prove he willfully attempted to evade or defeat tax and willfully failed to file tax returns.  Melot concedes his failure to move for judgment of acquittal following trial means this court reviews the issue under the plain error doctrine.  *United States v. Goode*, 483 F.3d 676, 681 n.1 (10th Cir. 2007) (en banc footnote) ("[A] forfeited claim of insufficient evidence must be reviewed under the plain-error standard . . . .").  However, "a conviction in the absence of sufficient evidence of guilt is plainly an error, clearly prejudiced the defendant, and almost always creates manifest injustice." *Id*.  Evidence is sufficient to support a conviction if the direct and circumstantial evidence and the reasonable inferences drawn therefrom, viewed in the light most favorable to the Government, would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt.  *United States v. Wilson*, 107 F.3d 774, 778 (10th Cir. 1997).  Having carefully reviewed the entire record and considered the arguments of the parties, this court concludes there is no merit to Melot's arguments regarding the

sufficiency of the evidence supporting his convictions for violating 26 U.S.C. §§ 7201 and 7203.

Melot concedes the Government's evidence showed he failed to file tax returns for the years in question and failed to pay federal taxes. His appellate argument is confined to an assertion the Government failed to prove he did so willfully. He argues he had a good-faith belief he was not violating the law. *See Cheek v. United States*, 498 U.S. 192, 201-02 (1991). To prove the element of willfulness, the Government was required to show Melot intentionally failed to report income and pay taxes he knew the law required him to report and pay. *See United States v. Hoskins*, 654 F.3d 1086, 1090 (10th Cir. 2011). The Government can meet its burden of proving actual knowledge without presenting direct evidence of Melot's state of mind. *See id*. That is, a jury can infer willfulness from a defendant's conduct.

The Government's evidence demonstrated overwhelmingly that Melot engaged in behavior consistent with an individual who had actual knowledge of his obligation to file returns and pay tax. Melot paid employees in cash, advising them they could avoid reporting the cash payments as income. He attempted to pay cash for inventory for his gas stations, in an effort to avoid creating a paper trail in his bank account. He used Social Security numbers he knew were false for numerous purposes. He transferred substantial assets into a foreign bank account but failed to file the necessary disclosure forms with the IRS. He

-12-

frequently made domestic bank deposits in amounts slightly below $10,000, the

amount at which he knew a bank must file a currency transaction report with the

Internal Revenue Service. He transferred assets to corporations and trusts and

used nominees to open bank accounts, but admitted he maintained control over

the assets associated with these accounts and entities. He sent letters to the

Internal Revenue Service denying he was a United States citizen or claiming to be

either a non-resident alien or a citizen of the "republic of New Mexico."

Nonetheless, when he applied for a passport from the State Department and

agricultural farm subsidies from the Department of Agriculture, Melot declared he

was a United States citizen.

In sum, the Government's evidence showed Melot routinely concealed

income and assets from the IRS; used cash extensively, informing others that this

was a means to avoid the payment of income taxes; and acted in a manner

inconsistent with his asserted belief he is not subject to federal income taxes

because he is not a citizen of the United States. All of the Government's

evidence, together with the reasonable inferences that can be drawn from it, is

amply sufficient to support the jury's finding that Melot was aware of his

obligation to file returns and pay federal taxes and negates any inference Melot

acted in good faith.[9]

---

[9]Melot points to his own testimony that (1) he genuinely believed the

(continued...)

*B. Sentence*

Melot raises two challenges to his sentence. The first implicates the calculation of his base offense level. The Presentence Investigation Report applied an offense level of thirty-eight and a criminal history category of II to arrive at an advisory guidelines range of 262-327 months' incarceration. Melot's base offense level was calculated based on an intended tax loss of approximately $33 million. The total tax loss included, *inter alia*, federal income taxes of $18.5 million, federal fuel excise taxes of $6.6 million, and state fuel excise taxes of $7.7 million. Melot argues it was error to include the federal and state fuel excise taxes in the calculation.

Tax loss, including any loss due to relevant conduct, is used to determine the base offense level for a tax offense. *See* U.S.S.G. §§ 2T1.1(a), 2T4.1; *United States v. Higgins*, 2 F.3d 1094, 1097-98 (10th Cir. 1993) ("[E]ven uncharged tax losses constitute relevant conduct which a sentencing court may consider in determining the basic offense level tax loss."). An offense is relevant conduct

---

[9](...continued)
information presented in the "tax protestor snake oil" documents he read, (2) did not read the disclaimers associated with that literature, and (3) did not understand the Internal Revenue Code because it was "too complex" for him, as support for his assertion he held a good-faith belief that he was not violating the law. Based on its verdict, however, the jury clearly disbelieved Melot's testimony. To the extent Melot also relies on the testimony of Dr. Samuel Roll, that reliance is misplaced. Dr. Roll, a psychologist, testified at the sentencing hearing, not the trial.

under U.S.S.G. § 1B1.3(a)(2) if "(1) the offense involved conduct described in §§ 1B1.3(a)(1)(A) and (B); (2) the offense would require grouping with the offense of conviction under U.S.S.G. § 3D1.2(d); and (3) the offense is part of the 'same course of conduct' or 'common scheme or plan' as the offense of conviction." *United States v. Clark*, 415 F.3d 1234, 1242 n.4 (10th Cir. 2005). Melot first argues the state fuel excise taxes do not qualify as relevant conduct because they are not groupable with his offenses of conviction. Although Melot sets out the relevant standard of review, his opening brief contains no separate analysis of the grouping issue. Instead, he interweaves his grouping argument with a separate argument that the failure to pay state and federal excise taxes is not relevant conduct because it is not part of the same scheme or course of conduct.

Although Melot's combination of the two issues muddles his argument, this court has no hesitation concluding the excise tax offenses were properly included in the total tax loss. The excise taxes were properly grouped because the relevant guideline provides that tax offenses should be grouped. *See* U.S.S.G. § 3D1.2(d) (listing tax offenses as offenses that "are to be grouped"). It is immaterial that the offenses involved different victims. *See* U.S.S.G. § 3D1.2(d) cmt. n.6 (providing an example of five theft convictions, each involving a different victim, as counts that are to be grouped together); *see also United States v. Springer*, 444 F. App'x 256, 265 (10th Cir. 2011) (unpublished disposition cited for persuasive

-15-

value) (grouping state tax losses with tax loss from federal conviction). The offenses of conviction and the evasion of fuel excise taxes were part of a common scheme or plan because both have a common purpose—the defeat of taxes owed. When "there is a continuing pattern of violations of the tax laws by the defendant," the Guidelines provide that the conduct is considered to be part of the same course of conduct or common scheme or plan. U.S.S.G. § 2T1.1 cmt. n.2 ("In determining the total tax loss attributable to the offense . . . , all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated."). Here, the evidence shows Melot's failure to pay fuel excise taxes occurred during the same period of time he was evading federal income taxes and the district court correctly characterized the steps he took to avoid paying taxes as demonstrating a "pattern of conduct . . . [that] endured in excess of twenty years."

Melot also argues there was insufficient evidence to support the district court's determination that he owed Texas fuel excise taxes because that determination was based on unreliable hearsay. The Government, which bore the burden to prove the amount of the tax loss, relied on state excise tax assessments made by the Texas Comptroller of Public Accounts. This court has previously held that tax assessments are prima facie evidence of a tax loss. *United States v. Chisum*, 502 F.3d 1237, 1244 (10th Cir. 2007). The district court found that "no

-16-

credible evidence contradict[s] the validity of these tax assessments." A review of the record confirms the correctness of this finding. The evidence was both reliable and sufficient to support the inclusion of the Texas fuel excise taxes in the tax loss calculation. The district court's ruling was not clearly erroneous.

Melot also challenges the portion of his sentence requiring him to pay restitution in the amount of the agricultural subsidies he received from the Department of Agriculture. He argues he would have qualified for the subsidies even if he had provided the correct identifying information to the Department of Agriculture. Thus, according to Melot, the only harm from his actions was the lost opportunity on the part of the IRS to garnish the subsidies he received. Melot's argument is easily rejected. The Government's trial evidence established that Melot provided false information to the Department of Agriculture when he applied for the agricultural subsidies. The director of the Farm Service Agency of the USDA testified that by making misrepresentations on the subsidy applications, Melot became ineligible to receive the subsidies. *See*, *e.g.*, 7 U.S.C. § 1308-1(a); *id.* § 1308-2(a); 7 C.F.R. § 1400.107. Thus, the district court did not err when it ordered Melot to pay restitution to the United States Department of Agriculture.

## IV. Cross-Appeal

In its cross-appeal, the Government argues the district court clearly erred in granting Melot a two-level decrease in his offense level for acceptance of

responsibility. The district court not only granted the two-level reduction, it also increased Melot's offense level for obstruction of justice. *See* U.S.S.G. § 3C1.1. Application Note 4 to § 3E1.1 of the Sentencing Guidelines counsels that both the obstruction-of-justice enhancement and the acceptance-of-responsibility reduction apply only in "extraordinary cases." This court has adopted the following test to determine whether a case is extraordinary:

> We . . . hold that in determining whether a case is "extraordinary" so as to merit both a § 3E1.1 reduction and a § 3C1.1 enhancement, the sentencing court must consider the totality of the circumstances, including, but not limited to 1) whether the obstruction of justice was an isolated incident or an on-going, systematic effort to obstruct the prosecution, and 2) whether defendant voluntarily terminated his obstructive conduct and truthfully admitted the conduct comprising the offense of conviction.

*United States v. Salazar-Samaniega*, 361 F.3d 1271, 1280 (10th Cir. 2004). The defendant must "present evidence to support the adjustment" and the district court must make findings to justify its conclusion that a particular case qualifies as an extraordinary case. *Id*. Here, the district court did not make the required findings. This is not a situation, however, in which it is appropriate to remand the matter to the district court to permit it to correct the procedural error. Had the district court not applied the obstruction-of-justice enhancement to calculate Melot's offense level, it was still clear error to grant Melot an acceptance of responsibility adjustment.

-18-

A district court has wide discretion in determining whether a defendant qualifies for the acceptance-of-responsibility reduction, and this court will not reverse the court's decision unless it is clearly erroneous. *United States v. Gauvin*, 173 F.3d 798, 805 (10th Cir. 1999); *see also* U.S.S.G. § 3E1.1 cmt. n.5 ("[T]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility and is, therefore, entitled to great deference upon review."). Despite this highly deferential standard of appellate review, it is the defendant's burden to prove entitlement to the § 3E1.1 adjustment. *United States v. Ivy*, 83 F.3d 1266, 1292 (10th Cir. 1996). Melot, thus, was required to "prove by a preponderance of the evidence that he has clearly demonstrated acceptance of responsibility for his offense." *Id.* (quotation and alteration omitted). The Sentencing Guidelines provide that a defendant can meet his burden by showing, *inter alia*, he truthfully admitted the conduct comprising the offense of conviction or voluntarily paid restitution prior to adjudication of guilt. U.S.S.G. § 3E1.1 cmt. n.1. A review of the record confirms Melot did neither of these things, nor did he engage in any other conduct demonstrating an acceptance of responsibility for his offenses. *See id.* (detailing a non-exhaustive list of factors the district court may consider when determining if a defendant has accepted responsibility). To the contrary, the record clearly shows Melot continued to deny that he

-19-

willfully engaged in criminal conduct[10]and unambiguously shows Melot did not

voluntarily pay restitution.[11]

Further, the Sentencing Commission has made clear that the acceptance of

responsibility adjustment "is not intended to apply to a defendant" like Melot

"who puts the government to its burden of proof at trial by denying the essential

factual elements of guilt, is convicted, and only then admits guilt and expresses

remorse."  U.S.S.G. § 3E1.1 cmt. n.2.  "In rare situations, however, a defendant

may clearly demonstrate an acceptance of responsibility for his criminal conduct

even though he exercises his constitutional right to a trial."  *Id*.  As guidance to

sentencing courts on what constitutes such a "rare situation," the Guidelines

provide the example of a defendant who "goes to trial to assert and preserve

---

[10]For example, although the jury found Melot guilty of making false statements to the Department of Agriculture, Melot testified under oath at the sentencing hearing that he "didn't lie or cheat or nothing" when he applied for the agricultural subsidies.  *See infra* n.13.

[11]Since his conviction, Melot has tenaciously opposed the Government's efforts to collect the restitution he was ordered to pay by the district court, attempting to thwart the collection of more than $18 million in outstanding income tax assessments and more than $6.5 million in outstanding excise tax assessments.  In 2012, a federal magistrate judge issued a certification of criminal contempt against him in the ancillary collection proceedings, finding he "actively and intentionally participated in a scheme to fraudulently create a third party interest in his properties with the intention of defrauding the Court, sabotaging the orderly administration of justice and delaying the United States' lawful efforts to recover the judgment as ordered by the Court."  Certificate of Criminal Contempt as to Billy R. Melot, August 6, 2012, *United States v. Melot*, No. 2:09-CV-00752 (D. N.M. (Dkt. No. 246)).  These post-sentencing actions may be considered by the district court during Melot's resentencing.  *See Pepper v. United States*, 131 S. Ct. 1229, 1242 (2011).

issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." *Id.* Here, Melot did not proceed to trial to preserve an issue unrelated to his factual guilt. He, instead, exercised his constitutional right to trial so he could challenge the mens rea element of the crimes charged in the indictment. *See United States v. Alvarez*, 2013 WL 5433604, at *3 (10th Cir. Oct. 1, 2013). He steadfastly maintained he did not commit the crimes charged because he did not act willfully.[12] His direct examination at trial began with the following exchange:

> Q. All right. Did you at any time act corruptly? By that I mean knowingly and dishonestly with the intent to secure an unlawful benefit for yourself or anyone else in your dealings with the Internal Revenue Service?
>
> A. No.
>
> Q. Let me ask you with respect to Count 2 of this Indictment, did you during the years indicated in the Indictment, and basically 1987 to 1999, did you believe that you owed the IRS any income tax? Substantial or otherwise.
>
> A. No.
>
>  . . . .
>
> Q. All right. With respect to Count 3 through 8, did you willfully, as you understood your obligation under the law, fail to file a tax return from years 2003 to 2008?
>
> A. No.

_____

[12]In his opening brief, Melot states his "defense was that he really believed that he did not owe any income taxes."

Q. Did you, sir with respect to Counts 9 through 15, make statements to . . . the United States Department of Agriculture with the intent of obtaining a thing of value? Did you make a false statement with that intent?

A. No.

Even after his conviction, he unflinchingly continued to maintain he did not act willfully. He filed a sentencing memorandum with the district court requesting the § 3E1.1 reduction and asserting he intended to testify at the sentencing hearing that "he went to trial in order to present to the jury that he did not willfully fail to pay taxes that he knew he owed." He further asserted he proceeded to trial because "he earnestly wished the jury to hear his rationale for not paying income taxes." Consistent with these statements in his memorandum, Melot denied he acted willfully at the sentencing hearing and maintained his innocence.[13]

Because the record contains absolutely no evidence supporting the application of the acceptance-of-responsibility reduction but, instead, clearly

---

[13]At the June 27th sentencing hearing, Melot testified he did not file tax returns or pay taxes because he did not believe he was required to file or pay, characterized some of the trial evidence against him as slander, continued to deny that he lied to the Department of Agriculture despite the jury's finding he did lie, denied his trusts owed any income taxes, claimed his corporations were only formed for liability purposes, testified he threw away all the documents that would demonstrate he did not owe the amount of taxes assessed, claimed he had paid all excise taxes but did not have the documentation to prove it, and said he did not recall if he had a bank account. The district court specifically found that Melot's "testimony at sentencing concerning tax matters" was not credible.

demonstrates Melot did not accept responsibility for his criminal conduct, the district court's determination that he was entitled to the § 3E1.1 decrease is clearly erroneous and Melot's sentence must be reversed.

**V.    Conclusion**

Melot's convictions are **affirmed**.  The matter is remanded to the district court with instruction to **vacate** Melot's sentence and resentence him without application of the § 3E1.1 adjustment.  The Government's motion for leave to file a supplemental letter brief is **denied**.  Melot's motion to strike the Government's motion is **denied** as moot.  Melot's motion to supplement the record on appeal is **granted**.